**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JOSHUA GREEN, derivatively on behalf of BELLRING BRANDS, INC.,<br><br>Plaintiff,<br>v.<br><br>DARCY HORN DAVENPORT, SHAWN CONWAY, THOMAS ERICKSON, JENNIFER KUPERMAN JOHNSON, CHONDA NWAMU, ELLIOTT STEIN, JR., ROBERT VITALE, and PAUL RODE,<br><br>Defendants,<br><br>-and-<br><br>BELLRING BRANDS, INC.,<br><br>Nominal Defendant. | Civil Action No. ___________<br><br>**JURY TRIAL DEMAND** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Joshua Green ("Plaintiff"), derivatively on behalf of BellRing Brands, Inc. ("BellRing" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Denha v. BellRing Brands, Inc.et al.,* Case No.: 1:26-cv-575 (S.D.N.Y.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly

available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of BellRing, on behalf of the Company against the Defendants (as defined herein). This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least October 1, 2024, to August 4, 2025 (the "Relevant Time Period"). During that time the Defendants caused or allowed BellRing to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. BellRing is the maker of what it calls "convenient nutrition" products like ready-to-drink protein shakes, energy bars, and protein powders. The Company's products are sold in club stores, grocery stores, online stores and specialty stores, with Walmart, Costco and Amazon accounting for 74% of net sales in fiscal year 2025. The Company's main brand is Premier Protein, which was responsible for 85.9% of BellRing's net sales in fiscal year 2025, with its ready-to-drink protein shakes making up 81.7% of the Company's net sales in fiscal year 2025.

3. The convenient nutrition market has grown significantly in the past few years, and BellRing has grown with it. In fiscal year 2023, BellRing reported net sales of $1.6 billion. That grew to $1.9 billion in fiscal year 2024 and $2.3 billion in fiscal year 2025. In 2024, to keep up with demand, the Company expanded its manufacturing capacity.

4. During the Relevant Time Period, Defendants represented to investors and analysts that the Company's sales growth was because of increased end-consumer demand. In addition, despite the growth in the convenient nutrition market, Defendants downplayed any impact from its competition on demand for its products, insisting that the Company had a "competitive moat,"

given that "the ready-to-drink category is just highly complex" and the products are "hard to formulate."

5. What the Company did not tell investors was that its sales growth was because of stores stockpiling inventory as a safeguard against product shortages that had previously plagued the Company. With the increased manufacturing capacity, stores reduced their inventory and reduced their new orders, revealing that competitive pressures were materially weakening demand.

6. On August 4, 2025, BellRing reported its financial results for its third quarter of fiscal year 2025 and "narrowed its fiscal year 2025 outlook for net sales," a move the market viewed as a negative signal about the Company's sales momentum. Only then was it revealed that competition was to blame for the new, narrower sales outlook.

7. On this news, the price of BellRing stock fell $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

8. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

9. Plaintiff Green is a current shareholder of BellRing and has continuously held BellRing stock during all times relevant hereto and is committed to retaining BellRing shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of BellRing and its shareholders in enforcing its rights.

**B. Nominal Defendant**

10. Nominal Defendant BellRing is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1 N. Brentwood Blvd., Suite 1550, St. Louis, MO 63105. BellRing common stock trades on the New York Stock Exchange under the ticker symbol "BRBR."

**C. Individual Defendants**

11. Defendant Darcy Horn Davenport has served as President, CEO and a director of the Company since 2019. Defendant Davenport will retire as President and CEO on the earlier of September 30, 2026, or the appointment of a new CEO.

12. Defendant Shawn Conway has been a director of the Company since 2023.

13. Defendant Thomas Erickson has been a director of the Company since 2019.

14. Defendant Jennifer Kuperman Johnson has been a director of the Company since 2019.

15. Defendant Chonda Nwamu has been a director of the Company since 2021.

16. Defendant Elliott Stein, Jr. has been a director of the Company since 2019.

17. Defendant Robert Vitale has been a director of the Company since 2019.

18. Defendants Davenport, Conway, Erickson, Kuperman Johnson, Nwamu, Stein, and Vitale are herein referred to as "Director Defendants."

19. Defendant Paul Rode has served as CFO of the Company since 2019.

20. Defendants Davenport and Rode are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in, is incorporated in, or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24. Venue is proper in this court under 28 U.S.C. § 1391, because the Company is incorporated in this District and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

25. BellRing was a subsidiary of Post Holdings, Inc. ("Post"), a consumer-packaged goods company known for its brands like Bob Evans, Weetabix, Honey Bunches of Oats, and Nutrish. BellRing held Post's active nutrition business, which included Premier Nutrition, Dymatize, the PowerBar brand, and Active Nutrition International. In 2022, BellRing was spun off from Post.

26. Before the Relevant Time Period, BellRing's financial results were largely shaped by supply issues. Demand often exceeded manufacturing capacity, meaning the Company often

struggled to produce enough products to fully meet retail orders. However, in early 2024, the Company expanded its manufacturing capacity. BellRing claimed that the increase in manufacturing capacity allowed the Company to focus on driving demand from end-users.

**B. Bellring's False and Misleading Statements**

27. From at least November 18, 2024, through August 4, 2025, BellRing and its executive officers made materially false and misleading statements about the strength, sustainability and drivers of the Company's sales growth, as well as the impact of competition on the demand for BellRing's products.

28. After the close of trading on November 18, 2024, BellRing issued a press release to announce its financial results for the fourth quarter and fiscal year 2024. In the press release, Defendant Davenport stated:

> We finished the year strong, with our results coming in at the high end of our expectations. . . . Our momentum remains high as we enter 2025. The convenient nutrition category continues to provide strong tailwinds, with ready-to-drink shakes and powders in the early stages of growth. We have leading mainstream brands that deeply resonate with consumers, giving us confidence in the long-term prospects for our company.

29. Also in the press release, BellRing stated, "Premier Protein net sales increased 20.3%, driven by 19.5% volume growth and 0.8% increase in price/mix. Premier Protein RTD shake net sales increased 20.7%, driven by 19.6% increase in volume and 1.1% increase in price/mix. Volume gains were driven by organic growth and distribution gains."

30. The next day, November 19, 2024, BellRing filed its Form 10-K Annual Report with the SEC. According to the Form 10-K: "[s]ales of *Premier Protein* products were up $317.8 million, or 23%, driven by 25% higher volumes primarily due to increased promotional activity (which resulted in lower average net selling prices), higher RTD shake production and distribution gains."

31. Also on November 19, 2024, the Company held a conference call with analysts and investors to discuss the recently reported financial results. During the call Defendant Davenport stated: "[o]ur full year results for the second year in a row meaningfully exceeded our long-term algorithm as we added shake capacity and began to layer in demand drivers." Defendant Davenport also stated: "we demonstrated that the demand [for Premier Protein] is there and will continue to grow as we layer in demand drivers" and "[s]trong macro tailwinds around protein are driving robust long-term growth in our categories with ready-to-drink and powder segments in the early stages of growth."

32. During the call, Defendant Rode stated:

> Premier Protein net sales grew 20%, primarily driven by strong volume growth for both RTD shakes and powders. RTD shake sales grew 21%, boosted by organic growth and distribution gains as well as a 1% benefit from our price increase taken in Q4. Shipment dollar growth outpaced consumption dollar growth with shipments benefitting from load ends of new distribution and Q1 promotions as well as replenishment of food channel shelf gaps.

33. On February 3, 2025, BellRing issued a press release reporting its financial results for the first quarter of fiscal year 2025. In the press release, Defendant Davenport is quoted as stating: "Our momentum remains high, with the convenient nutrition category continuing to drive robust growth. Our strong start to 2025 gives us greater confidence in the full year and drove our decision to raise our outlook."

34. Also according to the press release: "Premier Protein net sales increased 26.3%, driven by 21.4% increase in volume and 4.9% increase in price/mix. Premier Protein RTD shake net sales increased 25.3%, driven by 21.3% increase in volume and 4.0% increase in price/mix. Volume growth was driven by distribution gains and incremental promotional activity."

35. The next day, February 4, 2025, the Company filed its Form 10-Q financial report for the first quarter of fiscal year 2025 with the SEC. According to the Form 10-Q: "[s]ales of

*Premier Protein* products were up $96.0 million, or 26%, driven by 21% higher volumes. Volumes increased primarily due to distribution gains and incremental promotional activity."

36. Also on February 4, 2025, the Company held a conference call with analysts and investors to discuss the recently reported financial results. During Defendant Davenport's prepared remarks, she stated: "I'm pleased to share that fiscal '25 is off to a good start. The business accelerated as we layered in demand drivers and kicked off new campaigns[.]" Davenport concluded her prepared remarks by stating: "[i]n closing, our Q1 results position us well for another above algorithm year. Our organization has officially pivoted to demand driving. Strong macro tailwinds around protein are driving robust long-term growth in our category with ready-to-drink and powder segments in the early stages of growth."

37. During the call, Defendant Rode stated: "Premier Protein net sales grew 26% behind strong volume growth for RTD shakes and powders. Distribution gains, incremental promotions and organic growth drove the sales increase as well as a benefit from a price increase on shakes taken in Q4."

38. Later during the call, D.A. Davidson & Co. analyst Brian Patrick Holland noted that "capacity constraints are easing presumably not just for you but for the category" and that some small competitor brands are "having some nice growth," and asked: "curious how you're seeing the competitive landscape evolve around you as maybe more capacity becomes available." In response, Defendant Davenport downplayed competition, particularly in the ready-to-drink protein shake category:

> From a competitive standpoint, I would say there aren't a ton of major changes since the last several quarters. . . . the ready-to-drink category is just highly complex. It's hard to formulate. It takes 2-plus years to formulate these products . . . So it's just a much different . . . competitive moat, I would say, than in the other parts of the [convenient nutrition] category.

39. These statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that the Company's sales growth was attributable to temporary inventory stockpiling by several key stores, not increased demand. The statements also concealed the fact that increased competition was impacting demand.

**C. The Truth is Revealed**

40. On May 5, 2025, BellRing issued a press release reporting its financial results for the second quarter of fiscal year 2025. The next day, the Company held a conference call with analysts and investors to discuss the results. During the call, Defendant Rode revealed that beginning in the second quarter of fiscal year 2025, "several key retailers lowered their weeks of supply on hand, which is expected to be a mid-single-digit headwind to our third quarter growth." Defendant Rode also revealed:

> We now expect Q3 net sales growth of low single digits[.] Without the impact of these trade inventory changes, our underlying third quarter [sales] growth for Premier Protein RTD shakes would be more in line with our expected consumption growth of mid- to high teens.

Rode also stated that BellRing was expanding promotions to boost sales to "offset [] third quarter reductions in retailer trade inventory levels."

41. JPMorgan Chase & Co. analyst Kenneth B. Goldman noted that the destocking was "fairly substantial in size . . . when it's that substantial, typically, it doesn't happen unless there is . . . either deceleration in consumption or disappointment in consumption from the retailer side." In response to his question about what retailers had said about pulling back on orders, Defendant Davenport stated:

> So this is really tied to retail -- so specifically one, but a couple of retailers holding on kind of protecting themselves coming out of capacity constraints. They were a little bit hoarding inventory to make sure that they didn't run out of stock on shelf. And then we've now showed over several quarters of high in-stock rates and so

> they felt comfortable about bringing them down. We thought this could happen. We just had no idea when it would happen. And so – and we're seeing it.

However, she continued to misrepresent the strength of demand for BellRing's products, concluding her answer by adding, "[b]ut absolutely, no softness, no concern around consumption."

42. Then, on August 4, 2025, after market hours, BellRing issued a press release reporting its financial results for the third quarter of fiscal year 2025. In the press release, the Company revealed a disappointing new 2025 sales outlook, stating: "BellRing management has narrowed its fiscal year 2025 outlook for net sales to [a] range between $2.28-$2.32 billion[.]"

43. The following morning, the Company held a conference call with analysts and investors to discuss the financial results. During the earnings call, Defendant Davenport revealed that the disappointing new sales outlook was tied to increased competition. In her prepared remarks, Defendant Davenport stated, "[s]uccess attracts competition" and said, "it is not surprising to see new protein RTDs enter[ed] the [convenient nutrition] category, especially in its biggest channel cloud."

44. In response to a question comparing the narrowed outlook to past statements about the Company's "momentum," Defendant Davenport said that while BellRing had gained new inventory space in a key club retailer, "several other competitors gained . . . space as well. So we're assuming this increases some competitive pressure in club[.]"

45. During the call, Defendant Rode acknowledged that "consumption" had not outpaced "shipments" as the Company expected in the quarter, but rather, "[t]hey came in more in line."

46. On this news, the price of BellRing stock declined $17.46 per share, or nearly 33%, from $53.64 per share on August 4, 2025, to $36.18 per share on August 5, 2025, on unusually heavy trading volume.

**D. Defendants' Misconduct Has and Continues to Harm the Company**

47. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

48. BellRing's reputation and goodwill have also been damaged by the Defendants' misconduct.

**E. BellRing Issues a False and Misleading Proxy Statement**

49. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Time Period, including the Schedule 14A Proxy Statement filed with the SEC on December 17, 2024 (the "2024 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

50. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy before it was filed with the SEC and disseminated to BellRing's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy. These allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxy allegations and related claims.

51. In support of re-electing themselves, Director Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> **Role of the Board in Risk Oversight**
>
> The Board of Directors is responsible for the oversight of risk, while management is responsible for the day-to-day management of risk. The Board of Directors, directly and through its committees, carries out its oversight role by regularly reviewing and discussing with management the risks inherent in the operation of our business and applicable risk mitigation efforts. Management meets regularly to discuss our business strategies, challenges, risks and opportunities and reviews those items with the Board of Directors at regularly scheduled meetings.
>
> We do not believe that our compensation policies and practices encourage excessive and unnecessary risk- taking. The design of our compensation policies and practices encourages employees to remain focused on both short- and long-term financial and operational goals. For example, bonus plans measure performance on an annual basis but are subject to the Corporate Governance and Compensation Committee's ultimate judgment and discretion. In addition, equity awards typically vest over a number of years, which we believe encourages employees to focus on sustained stock price appreciation over an extended period of time instead of on short- term financial results.

52. The 2024 Proxy also stated that the Audit Committee monitored and oversaw the integrity of the Company's financial reporting, "systems of internal accounting, financial controls and disclosure controls" and "compliance with legal and regulatory requirements."

53. The 2024 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on the demand for the Company's products.

54. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F. The Board Breached its Fiduciary Duties**

55. As officers and/or directors of BellRing, the Defendants owed BellRing fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage BellRing in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of BellRing, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

56. Defendants, because of their positions of control and authority as directors and/or officers of BellRing, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding BellRing's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

57. To discharge their duties, the officers and directors of BellRing were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and BellRing were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

58. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of

good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

59. The Board's Audit Committee is tasked with overseeing BellRing's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of BellRing's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include oversight of:

- The quality and integrity of the Company's financial statements and financial reporting;
- The Company's compliance with legal and regulatory requirements, codes of conduct and ethics programs established by management and the Board; and
- The Company's systems of internal accounting and financial controls and disclosure controls.

60. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Erickson, Nwamu and Stein conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

61. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products,

management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

62. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on BellRing.

**DERIVATIVE ALLEGATIONS**

63. Plaintiff brings this action derivatively in the right and for the benefit of BellRing to redress injuries suffered by BellRing as a direct result of the Director Defendants' breaches of fiduciary duty. BellRing is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

64. Plaintiff will adequately and fairly represent the interests of BellRing in enforcing and prosecuting the Company's rights.

65. Plaintiff was a stockholder of BellRing at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a BellRing stockholder.

**DEMAND FUTILITY ALLEGATIONS**

66. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

67. The BellRing Board currently has eight members: the Director Defendants and David Finkelstein.

68. Plaintiff has not made any demand on BellRing's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

69. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

70. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of BellRing. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Davenport**

71. Defendant Davenport is the Company's CEO. According to the Schedule 14A Proxy Statement filed with the SEC on December 16, 2025 (the "2025 Proxy"), Defendant

Davenport received compensation of $6.5 million in fiscal year 2025 and $9.9 million in fiscal year 2024. Defendant Davenport depends on BellRing for her income. In addition, BellRing stated in the 2025 Proxy that Defendant Davenport is not independent pursuant to NYSE listing standards and SEC rules.

72. Defendant Davenport served as a director of the Company during the Relevant Time Period. As a director, Defendant Davenport had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Davenport was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

73. Defendant Davenport failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Davenport failed to protect corporate assets.

74. Defendant Davenport was an active participant in the misconduct described above. Defendant Davenport signed the 2025 Form 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Davenport made false and misleading statements concerning BellRing. Defendant Davenport therefore faces a substantial likelihood of liability.

75. In addition, Defendant Davenport is a named defendant in the Securities Class Action.

76. Thus, Defendant Davenport faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant Vitale**

77. Defendant Vitale served as a director of the Company and Chairman of the Board during the Relevant Time Period. As a director, Defendant Vitale had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Vitale was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

78. Defendant Vitale failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Vitale failed to protect corporate assets.

79. Defendant Vitale was an active participant in the misconduct described above. Defendant Vitale signed the 2025 Form 10-K. Defendant Vitale therefore faces a substantial likelihood of liability.

80. Defendant Vitale knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Vitale breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Vitale faces a substantial likelihood of liability for these breaches, making any demand on Defendant Vitale futile.

81. In addition, Defendant Vitale served as BellRing's Executive Chairman from 2019 to November 2024 and currently serves as Chairman of the Board. According to the 2025 Proxy, Defendant Vitale received compensation of $14.9 million in fiscal year 2022. Defendant Vitale has been the President and CEO of Post, and a member of Post's Board of Directors, since 2014. BellRing was a subsidiary of Post until its spin-off in 2022. Furthermore, BellRing stated in the

2025 Proxy that Defendant Vitale is not independent pursuant to NYSE listing standards and SEC rules. For these reasons, Defendant Vitale cannot independently consider a demand.

**C. Demand is Excused as to Defendant Conway**

82. Defendant Conway served as a director of the Company during the Relevant Time Period. As a director, Defendant Conway had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Conway was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

83. Defendant Conway failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Conway failed to protect corporate assets.

84. According to the 2025 Proxy, Defendant Conway received $257,763 in compensation in fiscal year 2025 in connection with his role as a Company director. Accordingly, Defendant Conway cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

85. Defendant Conway was an active participant in the misconduct described above. Defendant Conway signed the 2025 Form 10-K. Defendant Conway therefore faces a substantial likelihood of liability.

86. Defendant Conway knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Conway breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Conway faces a substantial likelihood of liability for these breaches, making any demand on Defendant Conway futile.

### D. Demand is Excused as to Defendant Erickson

87. Defendant Erickson served as a director of the Company during the Relevant Time Period. As a director, Defendant Erickson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Erickson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

88. Defendant Erickson failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Erickson failed to protect corporate assets.

89. According to the 2025 Proxy, Defendant Erickson received $284,429 in compensation in fiscal year 2025 in connection with his role as a Company director. Accordingly, Defendant Erickson cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

90. Defendant Erickson was an active participant in the misconduct described above. Defendant Erickson signed the 2025 Form 10-K. Defendant Erickson therefore faces a substantial likelihood of liability.

91. Defendant Erickson served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for monitoring and overseeing the integrity of BellRing's financial reporting, the Company's systems of financial controls and disclosure controls, and compliance with legal and regulatory requirements. The Audit Committee was thus responsible for reviewing and approving BellRing's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Erickson was thus responsible for knowingly or recklessly

allowing the improper statements concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on demand for the Company's products.

92. Defendant Erickson knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Erickson breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Erickson faces a substantial likelihood of liability for these breaches, making any demand on Defendant Erickson futile.

**E. Demand is Excused as to Defendant Kuperman Johnson**

93. Defendant Kuperman Johnson served as a director of the Company during the Relevant Time Period. As a director, Defendant Johnson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Johnson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

94. Defendant Kuperman Johnson failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Kuperman Johnson failed to protect corporate assets.

95. According to the 2025 Proxy Statement, Defendant Kuperman Johnson received $253,319 in compensation in fiscal year 2025 in connection with her role as a Company director. Accordingly, Defendant Kuperman Johnson cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

96. Defendant Kuperman Johnson was an active participant in the misconduct described above. Defendant Johnson signed the 2025 Form 10-K. Defendant Kuperman Johnson therefore faces a substantial likelihood of liability.

97. Defendant Kuperman Johnson knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Kuperman Johnson breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Kuperman Johnson faces a substantial likelihood of liability for these breaches, making any demand on Defendant Kuperman Johnson futile.

**F. Demand is Excused as to Defendant Nwamu**

98. Defendant Nwamu served as a director of the Company during the Relevant Time Period. As a director, Defendant Nwamu had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Nwamu was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

99. Defendant Nwamu failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor BellRing's controls, Defendant Nwamu failed to protect corporate assets.

100. According to the 2025 Proxy, Defendant Nwamu received $256,653 in compensation in fiscal year 2025 in connection with her role as a Company director. Accordingly, Defendant Nwamu cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

101. Defendant Nwamu was an active participant in the misconduct described above. Defendant Nwamu signed the 2025 Form 10-K. Defendant Nwamu therefore faces a substantial likelihood of liability.

102. Defendant Nwamu served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for monitoring and overseeing the integrity of BellRing's financial reporting, the Company's systems of financial controls and disclosure controls, and compliance with legal and regulatory requirements. The Audit Committee was thus responsible for reviewing and approving BellRing's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Nwamu was thus responsible for knowingly or recklessly allowing the improper statements concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on demand for the Company's products.

103. Defendant Nwamu knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Nwamu breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Nwamu faces a substantial likelihood of liability for these breaches, making any demand on Defendant Nwamu futile.

**G. Demand is Excused as to Defendant Stein**

104. Defendant Stein served as a director of the Company during the Relevant Time Period. As a director, Defendant Stein had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Stein was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

105. Defendant Stein failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor BellRing's controls, Defendant Stein failed to protect corporate assets.

106. According to the 2025 Proxy, Defendant Stein received $263,433 in compensation in connection with his role as a Company director. Accordingly, Defendant Stein cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

107. Defendant Stein was an active participant in the misconduct described above. Defendant Stein signed the 2025 Form 10-K. Defendant Stein therefore faces a substantial likelihood of liability.

108. Defendant Stein served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for monitoring and overseeing the integrity of BellRing's financial reporting, the Company's systems of financial controls and disclosure controls, and compliance with legal and regulatory requirements. The Audit Committee was thus responsible for reviewing and approving BellRing's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Stein was thus responsible for knowingly or recklessly allowing the improper statements concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on demand for the Company's products.

109. Defendant Stein knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Stein breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Stein faces a substantial likelihood of liability for these breaches, making any demand on Defendant Stein futile.

110. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

**Breach of Fiduciary Duty**
**(Derivatively Against The Director Defendants)**

111. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

112. Each of the Director Defendants owed and owes BellRing the highest obligations of loyalty, good faith, due care, and oversight.

113. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

114. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

115. In addition, the Director Defendants further breached their fiduciary duties owed to BellRing by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations regarding the strength, sustainability and drivers of BellRing's sales growth and the failure to disclose the impact of competition on the demand for Company's products. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false

and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

116. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

117. As a direct and proximate result of the breaches of duty alleged herein, BellRing has sustained and will sustain significant damages.

118. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

119. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## COUNT II

**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

120. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

121. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe BellRing the highest obligations of loyalty, good faith, due care, oversight, and candor.

122. The Officer Defendants breached their fiduciary duties owed to BellRing by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose misrepresentations regarding the strength, sustainability and drivers of BellRing's sales growth and the impact of competition on the demand for Company's products. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

123. As a direct and proximate result of the breaches of duty alleged herein, BellRing has sustained and will sustain significant damages.

124. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

125. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## COUNT III

**Gross Mismanagement**
**(Against All Defendants)**

126. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

128. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

129. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

130. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

131. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

132. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

133. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

134. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, BellRing has sustained significant damages.

135. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

136. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment (Derivatively Against the Officer Defendants)

137. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

139. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

140. Plaintiff, on behalf of BellRing, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI

### Violation of Section 14(a) of the Exchange Act (Against The Director Defendants)

141. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Director Defendants. The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

143. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), states that it is "unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title."

144. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, states that proxy statements must not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

145. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of misleading written statements to stockholders which were contained in the 2024 Proxy.

146. In the 2024 Proxy, the Board solicited stockholder votes to re-elect the Director Defendants to the Board. The 2024 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly

failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the strength, sustainability and drivers of BellRing's sales growth, as well as the impact of competition on the demand for the Company's products.

147. The misleading information contained in the 2024 Proxy was material to BellRing stockholders, who relied on that information when determining whether to relect the Director Defendants. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.

148. Plaintiff, on behalf of BellRing, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper re-election of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of BellRing and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of BellRing for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding BellRing restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 26, 2026

**LONG LAW, LLC**

By: */s/ Brian D. Long*
Brian D. Long (#4347)
3828 Kennett Pike, Suite 208
Wilmington, Delaware 19807
Telephone: (302) 729-9100 Email:
bdlong@longlawde.com

*Attorneys for Plaintiff*

OF COUNSEL:

**MURRAY LAW PLLC**
Brian Murray
750 E. Main Street, Suite 620
Stamford, CT06902
Telephone: (203) 883-2170
Email: bmurray@brianmurraylaw.com

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl 50
Main Street, Suite 1000
White Plains, New York 10606
Telephone: (914) 400-1920
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com